Approved: _____
KEDAR S. BHATIA
Assistant United States Attorney

Before: THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

```
- - - - - - - - - - - - - - - - - - - x   21 MAG 3583
                                       :
UNITED STATES OF AMERICA               : COMPLAINT
                                       :
         - v. -                        : Violations of
                                       : 21 U.S.C. § 846
JHONATTAN RODRIGUEZ and                :
VICTOR ALMONTE,                        : COUNTY OF OFFENSE:
                                       : Manhattan
                   Defendants.         :
                                       :
- - - - - - - - - - - - - - - - - - - x
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

MATTHEW W. HERBERT, being duly sworn, deposes and says that he is a Task Force Officer with the Drug Enforcement Administration ("DEA"), and charges as follows:

COUNT ONE

1. In or about March 2021, in the Southern District of New York and elsewhere, JHONATTAN RODRIGUEZ and VICTOR ALMONTE, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that JHONATTAN RODRIGUEZ and VICTOR ALMONTE, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance that JHONATTAN RODRIGUEZ and VICTOR ALMONTE, the defendants, conspired to distribute and possess with intent to distribute was 100 grams and more of

mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(B).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

4. I am a Task Force Officer with the DEA and a Detective in the Special Investigations Unit of the Woodbridge Police Department. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5. Based on my conversations with law enforcement officers, including a particular officer acting in an undercover capacity ("UC-1"), my review of documents, my training and experience, and my involvement in this investigation, I have learned the following, among other things:

    a. Since at least 2020, law enforcement officers have been investigating a particular group of individuals transporting narcotics from the Dominican Republic into the New York area. As part of that investigation, in or about March 2021, UC-1 communicated with a particular individual, later identified as JHONATTAN RODRIGUEZ, the defendant, as set forth herein. UC-1 communicated with RODRIGUEZ using a particular phone number with a Dominican Republic-based country code (the "Rodriguez Phone Number"). UC-1 principally communicated with RODRIGUEZ using WhatsApp text messages and WhatsApp "voice memos," which, based on my training and experience, are short audio recordings that can be exchanged between individuals. During communications between UC-1 and RODRIGUEZ, RODRIGUEZ had indicated that he resided in the Dominican Republic and had associates in the New York area who delivered narcotics on his behalf. During these communications, UC-1 knew and referred to RODRIGUEZ by the name "Jonathan," *i.e.*, RODRIGUEZ's first name.

    b. On or about March 1, 2021, after several narcotics-related communications, UC-1 told RODRIGUEZ that UC-1 wanted to

buy narcotics. RODRIGUEZ responded by proposing that he initially deliver a smaller sample of heroin first, which UC-1 could evaluate before agreeing to purchase a larger quantity. On or about March 8, 2021, RODRIGUEZ provided a particular phone number (the "CC-1 Phone Number") as the contact number for one of his associates in the New York area who could deliver the sample of heroin ("CC-1"). On or about the same day, UC-1 communicated with CC-1, using the CC-1 Phone Number, and agreed to meet with CC-1 at a particular location in Manhattan, New York ("Location-1").

   c. Later that day, on or about March 8, 2021, UC-1 drove to Location-1. When UC-1 arrived, UC-1 again communicated with CC-1, using the CC-1 Phone Number, and gave a description of the vehicle that UC-1 was driving. Soon afterwards, an individual entered UC-1's vehicle and handed UC-1 a small plastic-wrapped package containing a powdery substance (the "March 8 Narcotics"). The same individual then left UC-1's vehicle. Based on communications with UC-1 and my training and experience, I believe the March 8 Narcotics had an appearance and packaging consistent with unlawful controlled substances. As set forth below, the March 8 Narcotics were weighed and field-tested and found to be approximately nine grams of mixtures and substances containing a detectable amount of heroin. Based on my training and experience, the size of the March 8 Narcotics was consistent with a sample of narcotics given in anticipation of a larger sale.

   d. Following the March 8, 2021, transaction described above, both CC-1 and RODRIGUEZ contacted UC-1 to say, in substance and in part, that if UC-1 was satisfied with the sample, they could arrange for a larger sale.

   e. During UC-1's communications with RODRIGUEZ in March 2021, RODRIGUEZ indicated that he was planning a trip to the New York area soon, and that he could meet with UC-1 to deliver narcotics.

   f. On or about March 28, 2021, UC-1 contacted RODRIGUEZ using the Rodriguez Phone Number and asked to buy one kilogram of narcotics from RODRIGUEZ. RODRIGUEZ declined to sell UC-1 a kilogram but agreed to sell a half-kilogram. UC-1 proposed to meet with RODRIGUEZ in Manhattan, but RODRIGUEZ insisted on meeting in Queens, New York. On or about March 30, 2021, UC-1 and RODRIGUEZ agreed to meet at a particular location in Queens the next day, March 31, 2021 ("Location-2"). UC-1 agreed to pay RODRIGUEZ approximately $23,000 for the half-kilogram of heroin.

   g. On or about March 31, 2021, at the agreed-upon time, UC-1 and another officer acting in an undercover capacity ("UC-

2") traveled from New Jersey to Location-2 in Queens. UC-1 and UC-2 traveled to Location-2 in a particular vehicle ("Vehicle-1"). When UC-1 approached Location-2, UC-1 was on the phone with RODRIGUEZ, using the Rodriguez Phone Number. While on the phone call, UC-1 asked, in substance and in part, whether RODRIGUEZ was the person wearing a grey hooded sweatshirt. RODRIGUEZ responded, in substance and in part, that he was, in fact, wearing a grey hooded sweatshirt. UC-1 also observed RODRIGUEZ speaking on a cellphone, which was consistent with him speaking to UC-1 on the phone.

      h.  After UC-1 and UC-2 approached RODRIGUEZ in Vehicle-1, RODRIGUEZ got into the vehicle. UC-1, UC-2, and RODRIGUEZ drove to a nearby parking lot. RODRIGUEZ asked, in substance and part, to see the money for the transaction before he brought narcotics to the meeting. UC-1 declined, saying, in substance and part, that UC-1 wanted to see the narcotics first before showing RODRIGUEZ the money. Based on my training and experience, it is common for individuals in unlawful narcotics transactions to first meet without narcotics or cash to pay for those narcotics and then subsequently decide whether to complete the transaction. If the participant agrees to the transaction, they may then tell a co-conspirator to travel to the meeting location with the narcotics or cash.

      i.  After UC-1 declined to show RODRIGUEZ the money before seeing the narcotics, RODRIGUEZ repeatedly called another individual, later identified as VICTOR ALMONTE, the defendant. During the calls, UC-1 heard RODRIGUEZ asking his co-conspirator, *i.e.*, ALMONTE, to bring the narcotics. During this period when UC-1, UC-2, and RODRIGUEZ were waiting in Vehicle-1, RODRIGUEZ stated, in substance and in part, that he lived in the Dominican Republic and was planning to return there in a few days.[1] RODRIGUEZ also discussed different ideas for future meetings that would avoid the delay he and UC-1 were then experiencing. For example, RODRIGUEZ explained that UC-1 and he could do a "car swap" in which RODRIGUEZ or an associate would leave a quantity of narcotics inside a low-value vehicle at an agreed-upon location, deliver the car key to UC-1, and then UC-1 could access and drive away with the vehicle and narcotics.

      j.  After waiting in the parking lot for approximately 20 minutes, UC-1 observed ALMONTE approach Vehicle-1 and get into the vehicle. ALMONTE was carrying a weighted black bag ("Bag-1")

---

[1] Based on my communications with UC-1, I have learned that the conversation between RODRIGUEZ and UC-1 inside Vehicle-1 while they were waiting for ALMONTE was audio recorded.

when he approached and entered Vehicle-1. ALMONTE then handed Bag-1 to RODRIGUEZ. While ALMONTE was still inside Vehicle-1, RODRIGUEZ opened Bag-1 and retrieved from it a vacuum-sealed package (the "March 31 Narcotics"). RODRIGUEZ then handed the March 31 Narcotics to UC-1. Based on my communications with UC-1 and my training and experience, I believe the March 31 Narcotics had an appearance and packaging consistent with unlawful controlled substances. As set forth below, the March 31 Narcotics were weighed and field-tested and found to be approximately 500 grams of mixtures and substances containing a detectable amount of heroin.

   k. After RODRIGUEZ handed the March 31 Narcotics to UC-1, UC-1 agreed to get money from the transaction from Vehicle-1's trunk. UC-1 gave the arrest signal, and then law enforcement officers approached and arrested RODRIGUEZ and ALMONTE.

  6. After being arrested, law enforcement officers found on RODRIGUEZ's person four identification cards, all bearing his name, "Jhonattan Rodriguez." Two identification cards were apparently issued by New York State and two were apparently issued by the Dominican Republic.

  7. Based on my conversations with other law enforcement officers and my review of law enforcement records, I have learned that the March 8 Narcotics and the March 31 Narcotics were subsequently weighed and field tested. Based on the results of that testing, I have learned that the March 8 Narcotics constitute approximately nine grams of mixtures and substances containing a detectable amount of heroin, and the March 31 Narcotics constitute approximately 500 grams of mixtures and substances containing a detectable amount of heroin.

5

      WHEREFORE, I respectfully request that JHONATTAN RODRIGUEZ and VICTOR ALMONTE, the defendants, be imprisoned or bailed, as the case may be.

                          s/Matthew W. Herbert, by the Court, with permission
                          _____
                          MATTHEW W. HERBERT
                          Task Force Officer
                          Drug Enforcement Administration

Sworn to me through the transmission of this
Complaint by reliable electronic means,
pursuant to Rule 4.1 of the
Federal Rules of Criminal Procedure,
This 1st day of April, 2021.

                                                        (by telephone)
_____
THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York